IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

VICKIE PICKEL CHRISTOPHER,

       Plaintiff,

vs.                         CASE NO. 1:15-cv-106-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits pursuant to Title II of the Social

Security Act. (ECF No. 1.) The Commissioner has answered (ECF No. 8),

and both parties have filed briefs outlining their respective positions. (ECF

Nos. 11–12.) For the reasons discussed below, it is recommended that the

Commissioner's decision be affirmed.

### I.  PROCEDURAL HISTORY

Plaintiff filed her application for disability insurance benefits under

Title II on December 19, 2011, alleging a disability onset date of December

16, 2011. (R. 205–09.) Plaintiff alleged several impairments, including back injury and fibromyalgia. Her application was denied initially and upon reconsideration. (R. 83–134, 140–41, 143–48.) Following a hearing on August 16, 2013, an administrative law judge ("ALJ") issued a decision unfavorable to Plaintiff on October 18, 2013. (R. 20–38.) The Appeals Council denied Plaintiff's request for review. (R.  7–11.) On June 3, 2015, Plaintiff filed the instant appeal. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to

provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human*

*Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months. 42

U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment

must be severe, making Plaintiff unable to do his previous work, or any

other substantial gainful activity which exists in the national economy. 42

U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20

C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the

existence of a disability as defined by the Social Security Act. *Carnes v.*

*Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is

working at a substantial gainful activity, he is not disabled. 20 C.F.R. §

404.1520(b). Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his physical or mental

ability to do basic work activities, then he does not have a severe

impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a

claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

claimant's impairments (considering his residual functional capacity

("RFC"), age, education, and past work) prevent him from doing other work

that exists in the national economy, then he is disabled. 20 C.F.R. §

404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past

relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996,

1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278

(11th Cir. 2001).

## III.  SUMMARY OF THE RECORD

### A.  Medical Evidence

Plaintiff claims that she can no longer work due to back pain and

fibromyalgia. Plaintiff's medical records begin in 2003 when she had two

MRIs performed—one of her cervical spine and one of her lumbar spine.[2]

The MRI of her cervical spine showed evidence of central disk protrusions

at the C4–5 and C5–6 level, but the protrusions did not displace the

transversing nerve roots. (R. 348.) Plaintiff was diagnosed with minimal

spondylosis and loss of the normal cervical lordosis with cervical muscle

---

[2] Although the vast majority of Plaintiff's medical records regarding her back pain are from well before her disability onset date, they are nonetheless pertinent to her disability determination.

spasm. (*Id.*) The MRI of her lumbar spine was fairly normal and unremarkable, except for loss of the normal lumbar lordosis with evidence of lumbar muscle spasm.  (R. 349.) Plaintiff was diagnosed with lumbar muscle spasm. (*Id.*)

In April 2004, Plaintiff had a neurosurgical consultation with Joseph Cauthen, M.D. (R. 416.) Dr. Cauthen diagnosed Plaintiff with cervical spondylosis, minimal disc protrusion, chronic recurring cervical and lumbar pain, and hypothyroidism. (R. 420.) Dr. Cauthen opined, however, that, "[i]n view of near-normal MRI studies and normal physical findings, no surgical intervention is warranted. Additionally, the patient does not need additional diagnostic studies." (*Id.*) Dr. Cauthen recommended Plaintiff avoid cervical or lumbar exertional stress, continue her workouts in the gym, and return if symptoms become more specific, which might indicate cervical or lumbar nerve compression. (R. 421.)

Plaintiff underwent an independent medical evaluation in August 2004 by Steven M. Bailey, MD. (R. 432–34.) Dr. Bailey opined that Plaintiff's "history and physical examination is consistent with myofascial strain of the cervical and lumbar spine." (R. 434.) Further, he noted that Plaintiff's pain radiating into her arms and legs could be referred type pain.

(*Id.*) Her neurological examination was normal and the studies did not

show evidence of nerve root compression or spinal cord compromise. (*Id.*)

Plaintiff was evaluated by James W. Atchison, D.O., at the University

of Florida SpineCare Center in March 2005, at which time Plaintiff also had

x-rays taken of her lumbar spine and cervical spine. (R. 435, 470–71.)

Plaintiff was diagnosed with chronic cervical pain and chronic low back

pain. (R. 437.) Plaintiff was directed to work on an exercise program with

mild repetitive movements. (*Id.*) Notably, she was given permission to

"work full duty without restrictions." (*Id.*)

To obtain an evaluation to assess any psychological or behavior

health factors that may mediate Plaintiff's health condition and future

health maintenance, Plaintiff was referred to Lori B. Waxenberg, Ph.D., at

the University of Florida Psychology Clinic in July 2005. (R. 439.) Plaintiff's

pain ratings indicated that she was experiencing severe pain intensity and

moderate pain unpleasantness. (R. 440.) Test results also suggested that

Plaintiff was experiencing moderate emotional distress associated with her

pain. (*Id.*) Plaintiff's responses indicated mild to moderate depression,

significant anger, and a moderate level of pain-related anxiety. (*Id.*) Dr.

Waxenberg opined that Plaintiff's emotional distress was due solely to her

pain condition, whereby Plaintiff would benefit from pain management therapy. (*Id.*) Dr. Waxenberg recommended Plaintiff be instructed on relaxation techniques, learning activity pacing to assist with her daily activities, be treated with biofeedback to learn how to decrease muscle tension, be provided with cognitive therapy to treat her depression and anger, and be instructed on anger management. (R. 441.)

Plaintiff subsequently treated with the Psychology Clinic for six sessions from September 23, 2005 through November 4, 2005. (R. 449.) During the course of therapy, Plaintiff "demonstrated an increased knowledge regarding pain coping strategies," and was able to reduce the amount of pain medication that was prescribed to her. (*Id.*)

Interestingly, only a little more than a month later, on December 15, 2005 during a follow-up visit to the SpineCare Center, Plaintiff reported feeling worse overall even though she completed treatment with the Psychology Clinic. (R. 459.) Plaintiff's pain was an 8 out of 10. (*Id.*) Then, on July 20, 2006, Plaintiff reported that nothing had changed and she considered herself non-ambulatory. (R. 457.)  But, Plaintiff also reported working full-time without restrictions. (*Id.*) Dr. Atchison noted that although

Plaintiff has pain on the muscle, "it is not related to her spine." (*Id.*) Dr. Atchison recommended that Plaintiff see a rheumatologist. (R. 458.)

Two years later, Plaintiff's medical evidence resumes, at which time she began treating with Chota Community Health Services ("CCHS"). October 2008 medical records note that Plaintiff was doing well. (R. 472.) In January 2009, Plaintiff was doing well overall and was instructed to "[c]ontinue regular exercise." (R. 473.)

Plaintiff's medical records from December 2009 through September 2011 reveal no evidence of pain other than Plaintiff's self-reported health history of current problems with nerves, headaches, and backaches. (R. 490.) Notably, January 2011 exam notes evidence that Plaintiff's neck and back were normal, without any tenderness. (R. 488.) Then, in April 2011, Plaintiff was diagnosed with moderate post traumatic stress disorder, moderate major depressive disorder, and panic disorder without agoraphobic. (R. 483.)

After filing her application for disability insurance benefits on December 19, 2011, Plaintiff was referred to Linda S. Bojarski, Psy. D., for a general clinical mental status evaluation on January 23, 2012. (R. 510.)

Plaintiff reported that she graduated from high school. (*Id.*) Her average pain level was a seven to nine out of ten, with the most pain a nine and a half out of ten—which occurs every day. (*Id.*) Dr. Bojarski's evaluation included the following impressions: (1) Major depressive disorder, recurrent; (2) Panic disorder with agoraphobia; (3) Pain disorder associated with both psychological factors and a general medical condition; and (4) Nicotine dependence. (R. 513.)

Plaintiff was also referred to Samer R. Choksi, M.D., M.P.H., in April 2012 for a medical evaluation. (R. 515.) Plaintiff reported her pain as a seven on a scale of ten. (*Id.*) She also stated that she holds a high school diploma. (R. 516.) Dr. Choksi's evaluation revealed generalized tenderness throughout Plaintiff's body. (R. 516–18.) He also found "12 trigger points including the bilateral shoulders, hips, knees and ankles." (R. 516.) But, Plaintiff had a normal range of motion in her spine, normal motor, sensory, and reflex findings, and no muscle spasms. (R. 518.) She was also able to walk one block at a normal pace, walk over rough or uneven surfaces, carry out routine ambulatory activities such as shopping and banking, squat, and heel-to-toe walk. (*Id.*) Plaintiff's grip strength and fine

manipulation were normal and there were no motor deficits noted to the upper or lower extremities. (*Id.*) Dr. Choksi's diagnostic impressions included: (1) Back pain by history with no objective findings; (2) Fibromyalgia by history with no objective findings; and (3) Depression by history. (R. 518.)

In May 2012, Plaintiff established care with Pamela Lewin, M.D., at the Heart of Florida Health Center ("HFHC") (R. 533.) Plaintiff complained of chronic pain in her shoulders and back, daily headache, and that her medications have not worked. (*Id.*) Plaintiff reported having recently moved to Florida from Tennessee to be with her son. (*Id.*) According to Plaintiff, she had to quit working at Winn Dixie because she was moving. (*Id.*) She also reported back injury and pain, depression, fibromyalgia, and headache beginning in 2003. (*Id.*) Dr. Lewin ordered various tests and prescribed Plaintiff nine different medications. (R. 535–36.)

Plaintiff saw Dr. Marina Garcia, M.D., at the HFHC on May 16, 2012, at which time Plaintiff reported muscle spasms and pain. (R. 528.) Although her examination revealed cervical muscle spasms, Plaintiff had a normal range of motion in her spine and normal paraspinal muscle strength

and tone. (R. 530.) Dr. Garcia assessed Plaintiff with muscle spasm and fibromyalgia. (*Id.*) Dr. Garcia altered Plaintiff's medications and instructed Plaintiff to "exercise regularly." (R. 530–31.)

Due to abnormal lab results, Plaintiff went for a follow-up visit with Dr. Garcia  on June 18, 2012, at which time Plaintiff reported still having joint pain that was sometimes severe. (R. 522.) Additional tests were ordered and Plaintiff was prescribed three new medications. (R. 523–24.) Plaintiff was again instructed regarding exercise. (R. 524.) Later, on September 11, 2012, Dr. Garcia assessed Plaintiff with systempic lupus erythematosus and referred Plaintiff to a rheumatologist for further testing. (R. 548–49.)

In November 2012, rheumatologist Thomas E. Lafferty, M.D. PA, evaluated Plaintiff's joint pain. (R. 556.) Plaintiff reported joint pain all over her body, which was moderate to severe and exists all day. (*Id.*) Dr. Lafferty's examination, however, did not find any tender points consistent with fibromyalgia. (R. 558.) He diagnosed Plaintiff with joint pain involving multiple sites, Raynaud's Phenomenon,[3] Sicca Syndrome,[4] tobacco use

---

[3] "Raynaud's Phenomenon is a disorder that affects blood vessels, mostly in the fingers and toes." *Fast Facts About Raynaud's Phenomenon*, National Institute of Arthritis and Musculoskeletal and Skin Diseases, http://niams.nih.gov/health_info/Raynauds_Phenomenon/raynauds_ff.asp (Nov. 2014).

disorder, muscle spasm, and hypercalcemia.[5] (R. 558.) Dr. Lafferty ordered

additional tests, prescribed Zanaflex and Relafen, and instructed Plaintiff to

continue with the rest of her current medications. (*Id.*) Dr. Lafferty noted

that Plaintiff's treatment options were limited due to her self-pay status and

due to refractoriness of symptoms to treatment thus far. (*Id.*) He also

suggested a physical therapy referral and injections, which Plaintiff

declined. (*Id.*)

By February 25, 2013, Plaintiff's lab were stable. (R. 596.) But,

Plaintiff still reported continued joint pain. (*Id.*) She told Dr. Garcia that she

went to the rheumatologist for an evaluation, but that Dr. Lafferty ordered

additional tests, which Plaintiff could not afford. (*Id.*) Additionally, she said

---

The disorder causes the blood vessels to narrow when the subject is cold or stressed. *Id.* The subject's fingers and toes change color and may feel cold and numb from lack of blood flow. *Id.*

[4] Sicca Syndrome is also called Sjögren Syndrome. *Sjögren Syndrome - Genetics Home Reference*, National Institute of Health, https://ghr.nlm.nih.gov/condition/sjogren-syndrome#sourcesforpage (Aug. 2013). Sjögren Syndrome "is an autoimmune disorder in which the immune system attacks the glands that produce tears and saliva, thereby impairing the glands' ability to secrete the fluids. *Id.*

[5] Hypercalcemia is a condition in which there is too much calcium in the blood. *Hypercalcemia*, National Institute of Health, https://www.nlm.nih.gov/medlineplus/ency/article/000365.htm (last updated Feb. 20, 2014). It can cause a array of symptoms, including constipation, nausea, flank pain, frequent thirst and urination, muscle twitches, weakness, depresion, and bone pain. *Id.*

that although she went to the pain management clinic, Plaintiff still had pain. (*Id.*) Accordingly, Dr. Garcia recommended that Plaintiff be re-evaluated by rheumatology. (R. 598.)

## B.  Opinion Evidence

On May 2, 2012, James Patty, M.D., a state agency physician, performed a physical residual functional capacity assessment for Plaintiff. After reviewing Plaintiff's medical evidence, Dr. Patty opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and had unlimited pushing and/or pulling limitations other than her lifting and carrying limitations. (R. 114.)  Noting Plaintiff's past relevant work, including pricing manager and server, Dr. Patty concluded that Plaintiff has some limitations in the performance of certain work activities, but that the limitations would not prevent her from performing past relevant work as a server. (R. 115.)

## C.  Hearing Testimony

At the hearing on September 18, 2013, Plaintiff stated that she only completed eleventh grade and lives with her sister. (R. 42, 48.) Plaintiff has

a driver's license but only drives three times a month to the grocery store or doctor. (R. 43.)

On a typical day, Plaintiff wakes up and puts something on her neck and shoulders for pain, has coffee, then walks around and picks up things. (R. 53.) She has trouble dressing herself because her fingers do not handle the buttons well. (*Id.*) Plaintiff will then either go to the grocery store or take care of whatever she needs to do, such as vacuuming or laundry. (R. 54.) If she tries to vacuum, however, she has to stop for fifteen to twenty minutes because of the numbness and pain. (*Id.*) According to Plaintiff, she cannot mop or vacuum without pain. (R. 55.) In terms of meals, she has difficulty bending down to get things out of the oven so she usually just microwaves food. (R. 54.) Plaintiff says that she used to exercise but stopped a year ago. (R. 55–56.) Since then, none of her doctors suggested that she exercise. (R. 56.) Plaintiff also goes to church at least two Sundays a month, but is unable to go more frequently because of muscle spasms and back pain. (R. 56–57.)

Plaintiff says that she stopped working at Cracker Barrel on December 16, 2011 because she could no longer serve the tables or carry

the trays of food. (R. 43.) She was in too much pain and too depressed. (R. 44.) Plaintiff stated that she has pain from severe muscle spasms in her neck and shoulders, but she does not know what is causing the spasms. (R. 49.) She also has lower back pain and sciatic nerve numbness. (R. 50.)

Plaintiff testified that her muscle spasms started getting worse after she injured her lower back in an on-the-job accident while working at Winn-Dixie. (R. 57.) She stated that her back never got better after the accident. (R. 57–58.) Further, no one offered any type of surgery to try to relieve the back pain. (R. 58.) Plaintiff then stated, however, that surgeons told her that her pain would eventually get to the point where it would be so unbearable that she would have to have surgery. (R. 58.) She says she takes medications for the muscle spasms and back pain, but that the medications do not help. (R. 57.)

Dr. Betty Boysen initially diagnosed Plaintiff with fibromyalgia sometime around 1992. (R. 49–50.) Plaintiff was later diagnosed with lupus by Dr. Marcia Garcia in August 2012. (R. 51.) Dr. Garcia referred Plaintiff to a neurologist, but Plaintiff could only afford to see the neurologist, Dr. Lafferty, once. (R. 52.) Dr. Lafferty wanted Plaintiff to have some labs

performed to find out if Plaintiff has fibromyalgia and lupus, but Plaintiff never had them done because she could not afford the labs. (*Id.*) Nonetheless, Plaintiff thinks she has fibromayalgia and lupus because her skin is painful and is breaking down, she has difficulty swallowing, and her muscle and bones hurt. (R. 53.)

Plaintiff has seen a mental health physician for pain disorder, anxiety, and depression. (R. 58–59.) She also takes medication for depression. (R. 59.) According to Plaintiff, she gets aggravated with herself because of how things are and she is depressed because the pain does not get better. (*Id.*) She is also afraid to leave home because she feels like she will get out and have a panic attack. (R. 61.) Crowds also bring on her panic attacks and she had several panic attacks while working. (R. 62.)

Additionally, Plaintiff gets numbness in her arms, which is triggered from driving, vacuuming, mopping, and picking things up. (R. 60.) She can, however, lift a gallon of milk. (R. 64.) She can only stand comfortably for fifteen minutes. (R. 63.) After fifteen minutes of standing, however, Plaintiff gets pain in the front of her abdomen that then wraps around to the back side of both legs. (*Id.*) Similarly, she can only walk for approximately fifteen

minutes. (R. 65.) She also stated that she can only sit comfortably for twenty minutes before she starts having lower back pain and pain down the back of her legs. (R. 63) Three or four times a month, Plaintiff's pain is so bad she has to lay down and can hardly move. (R. 64.)

**D.  The ALJ's Findings**

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2014. (R. 25.) The ALJ further determined that Plaintiff had not engaged in substantial gainful activity since December 16, 2011. (*Id.*) The ALJ found that Plaintiff had the following severe impairments: disorders of the spine and fibromyalgia. (*Id.*) The ALJ went on to find at step three of the sequential evaluation that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. 27.)

With respect to Plaintiff's residual functional capacity at step four of the sequential evaluation, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § § 404.1567(b), except no overhead work. (*Id.*)

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible for the reasons discussed in the ALJ's decision. (R. 31–32.) The ALJ concluded at step four that Plaintiff was capable of performing past relevant work, including cashier checker and informal waitress. (R. 32.) The ALJ noted that this past relevant work does not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity. (*Id.*) Accordingly, the ALJ concluded that Plaintiff has not been under a disability from December 16, 2011, through the date of the ALJ's decision. (R. 33.)

## IV.  DISCUSSION

Plaintiff raises two issues on appeal: (1) Whether the ALJ erred by failing to apply Social Security Ruling ("SSR") 12-2P regarding the evaluation process for claimants with fibromyalgia; and (2) Whether the ALJ erred in failing to properly apply the Eleventh Circuit's pain standard. (ECF No. 11 at 1, 6.) After review of the decision and the substantial

evidence of record, the Court concludes that the ALJ did not err in either respect.

## A.    The ALJ Properly Applied SSR 12-2P.

SSR 12-2P provides guidance concerning how evidence is developed to establish that a claimant has a medically determinable impairment of fibromyalgia, as well as how fibromyalgia is evaluated under the Act. Under the ruling, fibromyalgia is a medically determinable impairment when it is established by appropriate medical evidence. SSR 12-2P, 2012 WL 3104869, at *2 (July 25, 2012). Once it is established that the claimant has a medically determinable impairment of fibromyalgia, the normal five step sequential evaluation process is used to determine whether the claimant is disabled. *Id.* at *5.

Plaintiff appears to misunderstand SSR 12-2P. Citing SSR 12-2P section II, Plaintiff claims that the ALJ failed to apply the analysis required by SSR 12-2P. (ECF No. 11 at 9.) The vast majority of Plaintiff's argument then points to various evidence demonstrating that Plaintiff suffers from fibromyalgia. The problem with this argument, however, is that section II refers to specific criteria that establishes a person has a medically

determinable impairment of fibromyalgia. *See* SSR 12-2P, 2012 WL

3104869, at *2–3. In this case the ALJ concluded that Plaintiff *does* have a

medically determinable impairment of fibromyalgia. Further, the ALJ found

that Plaintiff's fibromyalgia is a severe impairment under step two of the

sequential analysis. (R. 25.) The ALJ explained that although Plaintiff

testified that she was diagnosed with fibromyalgia in 1992, Plaintiff's

medical records do not reveal clinical abnormalities consistent with

fibromyalgia. Nonetheless, the ALJ resolved the doubts in Plaintiff's favor

and included fibromyalgia as a severe impairment at Step Two of the

sequential analysis. Any argument that the ALJ erred in applying SSR 12-

2P to determine whether Plaintiff has a medically determinable severe

impairment of fibromyalgia is, therefore, simply wrong.

Plaintiff's argument is wholly devoid of any other suggestion as to

how the ALJ failed to follow SSR 12-2P. Nonetheless, an independent

review of the record demonstrates that the ALJ properly applied SSR 12-

2P in all respects regarding Plaintiff's fibromyalgia.

After step two, the ALJ properly proceeded with the sequential

evaluation as instructed by SSR 12-2P. The ALJ's analysis ended at step

four, however, because the ALJ determined that Plaintiff can perform past

relevant work.

At step four, a diagnosis of fibromyalgia is relevant to pain and other associated symptoms when determining a claimant's RFC—including exertional and non-exertional limitations.[6] Additionally, SSR 12-2P requires that "a longitudinal record [be considered] whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" 2012 WL 3104869, at *6.

The ALJ properly evaluated Plaintiff's RFC under SSR 12-2P. The ALJ undoubtably considered a longitudinal record. Although Plaintiff's alleged disability onset date was December 16, 2011, the ALJ considered medical records from as far back as 2003. Further, as will be discussed in detail below, the ALJ properly considered Plaintiff's pain and other associated symptoms when determining Plaintiff's RFC. The evidence demonstrates that the ALJ properly applied SSR 12-2P.

---

[6] At step four, SSR 12-2P provides that,

> [w]idespread pain and others symptoms associated with [fibromyalgia], such as fatigue, may result in exertional limitations that prevent a person from doing the full range of unskilled work in one or more of the exertional categories in appendix 2 of subpart P of part 404 (appendix 2). People with [fibromyalgia] may also have nonexertional physical or mental limitations because of their pain or other symptoms. Some may have environmental restrictions, which are also nonexertional.

2012 WL 3104869, at *6.

**B.     The ALJ Properly Applied the Eleventh Circuit's Pain Standard.**

At step four the ALJ must assess the claimant's RFC and her ability

to return to her past relevant work. § 404.1520(a)(4)(iv). The ALJ must take

the claimant's medical evidence and other evidence into consideration in

his RFC analysis. § 404.1520(e). If a claimant cannot return to her past

relevant work, the ALJ moves onto step five to determine if the claimant

can adjust to other work. *Id.*; *Phillips v. Barnhart*, 357 F.3d 1232, 1238

(11th Cir. 2004).

In determining Plaintiff's RFC at step four, the ALJ was limited to

Plaintiff's allegations of pain. Plaintiff's medical records reveal remarkably

benign functional findings. Similarly, and notably, none of Plaintiff's treating

physicians even suggested, much less instructed, that Plaintiff has

functional or exertional limitations. The ALJ was, therefore, required to

consider Plaintiff's pain under the Eleventh Circuit's three-part pain

standard.

Plaintiff argues that the ALJ failed to properly apply the Eleventh

Circuit's pain standard. Plaintiff contends that substantial evidence

demonstrates that Plaintiff has fibromyalgia and chronic back pain, and

therefore, the ALJ erred in discrediting Plaintiff's pain testimony.

Under the Eleventh Circuit's pain standard, a claimant may establish her disability through his own testimony of pain or other subjective symptoms. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *Foote v. Chater*, 67 F.3d 1553, 1560–61 (11th Cir. 1995). The ALJ must consider a claimant's testimony of pain and other subjective symptoms where the claimant meets the Eleventh Circuit's three-part "pain standard." *See Foote*, 67 F.3d at 1560. Under that test, evidence of an underlying medical condition must exist. *Id.* If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying medical condition, or evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms. *Id.* A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability. *Id.* at 1561.

If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce her symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work. 20 C.F.R. §

404.1529(c)(1). In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and her doctors. *Id*. § 404.1529(c)(1)–(2). The ALJ may consider other factors, such as: (1) The claimant's daily activities; (2) The location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) Any precipitating and aggravating factors; (4) The type, dosage, effectiveness, and side effects of the claimant's medication; (5) Any treatment other than medication; (6) Any measures the claimant used to relieve her pain or symptoms; and (7) Other factors concerning the claimant's functional limitations and restrictions due to her pain or symptoms. *Id.* § 404.1529(c)(3). The ALJ then will examine the claimant's statements regarding her symptoms in relation to all other evidence, and consider whether there are any inconsistencies or conflicts between those statements and the record. *Id.* § 404.1529(c)(4).

If the ALJ decides not to credit the claimant's testimony as to her subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding. *See Foote*, 67 F.3d at 1561–62. While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was

incredible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.* at 1562. The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991). The Court will not disturb a properly articulated credibility finding that is supported by substantial evidence. *Foote*, 67 F.3d at 1562. The failure to articulate reasons for discrediting a claimant's subjective testimony, however, requires that the testimony be accepted as true and becomes grounds for remand where credibility is critical to the outcome of the case*. Id.*

The Eleventh Circuit's pain standard may be applied to complaints of subjective conditions other than pain. *See Swindle v. Sullivan*, 914 F.2d 222 (11th Cir. 1990) (the Eleventh Circuit applied the pain standard to the claimant's complaints of pain and dizziness); *Pitts v. Comm'r of Soc. Sec.*, Case No. 01-16397, Slip op. at 8 (11th Cir. May 1, 2002) (considering the claimant's complaints of fatigue due to Chronic Fatigue Syndrome under the three part pain standard). The ALJ is not required to recite the pain standard, but she must make findings that indicate that the standard was applied. *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir.

2013). Whether objective medical impairments could reasonably give rise to the alleged pain is a question of fact for the Commissioner and the district court is only to review to ensure that the Commissioner's finding is supported by substantial evidence. *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

At step four, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 31). It is abundantly clear that the ALJ found evidence of an underlying impairment under the first prong of the pain standard, to wit: back disorders and fibromyalgia. Plaintiff argues, however, that her systemic lupus erythematosus is a third underlying medical condition. Although Dr. Garcia assessed Plaintiff with lupus, she specifically referred Plaintiff to a rhematologist for further evaluation. Notably, Dr. Lafferty's report does not reveal a finding of lupus. Instead, Dr. Lafferty wanted Plaintiff to have further testing done to find out *if* she has lupus, which Plaintiff herself admitted at the hearing. Nonetheless, even if lupus is an additional underlying medical condition, it is irrelevant under the first prong because the ALJ concluded that Plaintiff does have underlying medical conditions.

As to the second prong, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 31). But, in determining whether the pain standard is met, the credibility of the claimant's testimony must be considered. *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988).

In this case, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 32.)[7] The ALJ then included detailed explanation supporting

---

[7] Relying on *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), Plaintiff argues that based on the ALJ's boilerplate language, the ALJ applied the wrong standard to her credibility determination. (ECF No. 11 at 15–16.) In *Bjornson*, the Seventh Circuit took issue with the boilerplate language, explaining that "the passage implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards." 671 F.3d at 645.

First, however, as the Commissioner correctly points out, Seventh Circuit cases are not binding on this Court. Further, the Eleventh Circuit does not appear to have adopted this rationale, nor does Plaintiff cite any Eleventh Circuit cases suggesting such. *See Thompkins v. Colvin*, No. 5:13-CV-96 (MTT), 2014 WL 4629166, at *6 (M.D. Ga. Sept. 15, 2014); *Decook v. Colvin*, No. 3:12-cv-1122-J-JRK, 2014 WL 1249325, at *11 n.10 (M.D. Fla. Mar. 26, 2014); *Birchfield v. Colvin*, No. 8:13-CIV-258-T-EAK-MCR, 2014 WL 794320, at *9 n.10 (M.D. Fla. Feb. 26, 2014).

Secondly, subsequent cases from the Seventh Circuit clarified that despite the inclusion of the boilerplate language, an ALJ's decision can be affirmed where the ALJ justifies her credibility analysis. *See Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013) ("the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination"); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) ("If the ALJ has otherwise explained his conclusion adequately, the inclusion of this language can be harmless."). Here, the ALJ did not blindly rely on this boilerplate language; instead, as discussed, the ALJ provided more than a half page of thorough explanation listing the specific reasons that Plaintiff's statements were not

her credibility determination. For the following reasons substantial evidence

supports the ALJ's reasons for discrediting Plaintiff's statements.

First, the ALJ found that "the overall evidence of record shows that

the bulk of the claimant's treatment has been rather conservative as it has

consisted primarily of medication management." (R. 32.)  A conservative

treatment plan, consisting primarily of pain medication, may be a reason to

discount a claimant's statements concerning the intensity, persistence, and

limiting effects of pain symptoms. *See Laurey v. Comm'r of Soc. Sec.*, 632

F. Ap'x 978, 988 (11th Cir. 2015) (substantial evidence, including a

conservative treatment plan consisting of pain medication, muscle relaxers,

and physical therapy, supported the ALJ's determination); *Crow v. Colvin*,

36 F. Supp. 3d 1255, 1262–63 (N.D. Ala. 2014) (noting that a doctor's

conservative medical treatment for a particular condition tends to negate a

claim of disability).

Since Plaintiff's disability onset date, Plaintiff has only recieved

treatment in the form of various medications. Although Dr. Lafferty offered

an injection, Plaintiff declined. (R. 558.) Dr. Lafferty also offered a physical

---

entirely credible. Even assuming that the boilerplate language was problematic—which
it was not—the ALJ properly justified her credibility analysis.

therapy referral, which Plaintiff also declined. (*Id.*) Further, as Plaintiff testified, none of her doctors have suggested any type of surgery to alleviate her pain since her disability onset date.

Secondly, the ALJ found that "not only has her treatment been rather conservative, but her overall objective exam findings have been rather benign as well." (R. 32.) The evidence strongly supports this finding.

For example, Dr. Choksi's examination of Plaintiff revealed largely normal findings. Although Dr. Choksi found twelve trigger points throughout Plaintiff's body, he also determined that Plaintiff had an intact range of motion throughout her spine and extremities, 5/5 motor strength in her upper and lower extremities, 5/5 grip strength in her hands, normal fine manipulation of the hands, normal sensory fingertips, a normal gait, no sensory or motor neurological defects, negative supine and seated straight leg raise, normal cerebella function, and no median nerve compression. (R. 516–18.) Dr. Choski also found that Plaintiff could walk one block at a normal pace, walk over rough or uneven surfaces, carry out routine ambulatory activities such as shopping and banking, squat, and do heel-to-toe walking. (R. 518.)

Similarly, although Dr. Lewin's examination revealed cervical muscle

spasms, the examination documented a normal range of motion in

Plaintiff's spine and normal paraspinal muscle strength and tone. (R. 530.)

To the extent that Plaintiff's 2003 MRI revealed some minimal spondylosis,

there are no recent MRIs or CT scans that demonstrate any  orthopedic

issues, nor did the spondylosis prevent Plaintiff from working for many

years afterwards.

Further, Dr. Lafferty's physical examination of Plaintiff was

remarkably normal, other than minor missing lateral flexion in Plaintiff's

neck, some evidence of groin and shoulder joint pain, slightly diminished

muscle strength in the C7 dermatome and L3 dermatome, several tender

points, and decreased light touch sensation on the left L3 dermatome and

L5 dermatome. (R. 557–58.)  Although Dr. Garcia assessed Plaintiff with

fibromyalgia, Dr. Lafferty did not find any tender points consistent with

fibromyalgia. (R. 530, 558.)  And while lab tests in September 2012

revealed elevated white blood cell levels, antinuclear antibodies,[8] and

---

[8] "A positive ANA test means autoantibodies are present. By itself, a positive ANA test does not indicate the presence of an autoimmune disease or the need for therapy." *Antinuclear Antibodies (ANA)*, Am. College of Rheumatology, http://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Antinuclear-Antibodies-ANA (updated June 2015). "The presence of large amount[s] of autoantibodies or ANAs can indicate an autoimmune disease. ANAs could signal the body to begin attacking itself which can lead to autoimmune diseases, including lupus, scleroderma, Sjögren's syndrome, polymyositis/dermatomyositis, mixed connective tissue disease, drug-induced lupus, and autoimmune hepatitis." *Id.*

hyperlipidemia, and in November 2012, hypercalcemia, Plaintiff's most

recent lab tests on February 25, 2013, were normal. (R. 546, 558, 596.)

The ALJ also correctly pointed out that Plaintiff was only seen twice

in 2013 during the seven and a half months before her administrative

hearing—once by Dr. Lafferty, and once by Dr. Garcia.[9] This suggests that

Plaintiff's condition was not as disabling as she asserts.  And to the extent

that Plaintiff's medical records from 2003 demonstrate lumbar muscle

spasm, minimal spondylosis and loss of the normal cervical lordosis with

cervical muscle spasm, the ALJ took this into account and limited Plaintiff

to no overhead work.

Although Plaintiff testified at the hearing that she did not have

additional testing done because she could not afford it and did not have

insurance, Plaintiff also suggested at the hearing that her children have

offered to assist her with payments. (R. 52–53.)[10] Non-compliance can be

justified when a claimant cannot afford the prescribed treatment. *Dawkins*

*v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988); *see also Taylor v. Bowen*,

---

[9] Although Plaintiff went to TriCounty Hospital on February 21, 2013, it was for a non-related lung issue. (R. 566–70.)

[10] At the hearing, the ALJ asked Plaintiff if she had the additional testing done to find out if she had lupus. (R. 52.) Plaintiff responded that she had not because one was $500 and she could not take that from her kids. (R. 52–53.) She also stated that her son paid for her to see Dr. Lafferty. (R. 52.)

782 F.2d 1294, 1298 (5th Cir. 1986) (when a "claimant cannot afford the prescribed treatment and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law"). But, the evidence here raises a question as to whether Plaintiff has the ability to obtain funds for recommended testing and additional doctor's visits. Nonetheless, to the extent that Plaintiff cannot afford additional doctor's visits and testing, the ALJ did take into account that Plaintiff's lack of funds and insurance "certainly would have an effect on her ability to receive medical care." (R. 32.) As the ALJ correctly noted, lack of funds and insurance cannot, alone, establish disability.

Thirdly, in addition to Plaintiff's conservative treatment and overall benign exam findings, the ALJ also concluded that Plaintiff made statements to the court during her administrative hearing that were inconsistent with her medical records. Specifically, the ALJ asked Plaintiff if Plaintiff smokes. (R. 56.) Plaintiff responded, "no." (*Id.*) The ALJ correctly noted that this testimony contradicts Plaintiff's medical records.[11]

---

[11] At her consultative examination with Dr. Bojarski on January 2, 2012, Plaintiff reported smoking up to one pack per day. (R. 511.) Similarly, at her consultative examination with Dr. Choksi in April 2012, Plainitff reported smoking one-half pack of cigarettes per day for ten years. (R. 516.) Notably, Dr. Garcia's August 15, 2013 progress note—from the day before the administrative hearing—indicates that Plaintiff "currently uses tobacco," and includes a notation of "1/2 pack per day." (R. 578.)

An independent review of the record also demonstrates inconsistent statements regarding exercise, employment, and education. At the hearing, the ALJ specifically asked Plaintiff whether any of Plaintiff's doctors suggested that Plaintiff exercise, to which Plaintiff responded "no." (R. 56.) But, the record demonstrates that on May 16, 2012, Dr. Garcia instructed plaintiff to "exercise regularly." (R. 531.) Dr. Garcia also discussed exercise with Plaintiff again on June 18, 2012. (R. 524.)

As to employment, Plaintiff testified that she worked at Cracker Barrel in Tennessee before moving to Florida. (R. 46–47.) Plaintiff also testified that she had to quit working at Winn Dixie because she could not do overhead work and stand all day. (R. 45.) But, she also told Dr. Lewin that she had quit working at Winn Dixie because she moved from Tennessee to Florida. (R. 533.)  And with respect to education, Plaintiff testified that she only completed eleventh grade, yet she reported completing twelfth grade and receiving her high school diploma to various medical professions. (R. 42, 430, 516.)

Plaintiff's misleading testimony and inconsistent statements further suggest that her condition may not be as disabling as alleged. Although the misleading testimony and inconsistent statements may not be the result of

a conscious intent to deceive the ALJ, it is nonetheless up to the ALJ to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). The ALJ has wide latitude in evaluating the weight of evidence, particularly the credibility of witnesses. *Owens v. Heckler*, 748 F.2d 1511, 1514 (11th Cir. 1984). Where, as here, substantial evidence supports the ALJ's credibility determinations, the Court cannot overturn the ALJ's findings.

Fourth, the ALJ considered Plaintiff's overall sporadic and inconsistent work history. (R. 32.)  An ALJ is entitled to consider a claimant's work and earnings history prior to the alleged onset date. Sporadic work history and earnings prior to the alleged disability onset date can raise a question as to whether a claimant's unemployment is actually due to pain. *See, e.g.*, *Phillips v. Astrue*, Case No. 606-104, 2008 WL 2156717, at *9 (S.D. Ga. May 22, 2008) (plaintiff's poor earnings record, which showed poor motivation to work, undermined her allegations).

Plaintiff's earning records demonstrate that she had no earnings from 1994 through 1997, 1999 through 2000, 2009 through 2010, and 2012. (R. 209, 221, 225). During 2007 and 2008, Plaintiff worked at National Health Corporation ("NHC"). (R. 218.) Plaintiff admitted that after NHC, she was

unemployed, during which time she was living in Tennessee, was married, divorced, and then moved back to Florida in 2010. (R. 46–47.) Then, however, Plaintiff testified that she was working at Cracker Barrel in Tennessee for over a year from late 2009 through 2010 before transferring to Florida in 2010. (*Id.*) As the ALJ correctly noted though, Plaintiff does not have any earnings in her record for that period of time. Nonetheless, to the extent that Plaintiff claims she did not work for a period of time while in Tennessee because she was married and then got divorced, the ALJ considered this in making her credibility determination.

Finally, and most notably, the ALJ considered and relied upon the fact that none of Plaintiff's treating physicians opined that Plaintiff has exertional limitations or that Plaintiff is disabled. (R. 32.) The proper focus in determining a claimant's RFC is the claimant's functional limitations, not her diagnosis. *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). A lack of medical reports indicating exertional limitations suggests that a claimant's impairments may not be as limiting as alleged. *See Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) (finding that substantial evidence supported the ALJ's conclusion that plaintiff's impairments were not severe because there were no reports indicating

exertional limitations).

The record before the Court is wholly devoid of any suggestion that Plaintiff's treating physicians imposed or even suggested that Plaintiff has exertional or nonexertional limitations, or that Plaintiff is disabled. Although Plaintiff reported to Dr. Garcia that she had severe joint pain at times with movement disability, Dr. Garcia—Plaintiff's own treating physician—instructed Plaintiff to exercise.  And although Dr. Lafferty diagnosed Plaintiff with joint pain, Raynaud's Phenomenon, Sicca Syndrome, muscle spasm, and hypercalcemia in November 2012, Dr. Lafferty's physical examination was, in large part, normal. Further, Dr. Lafferty's report is devoid of any restrictions with respect to Plaintiff's activities of daily living. (R. 556–58.) Interestingly, and highly instructive, none of Plaintiff's physicians even provided a residual functional capacity assessment. Moreover, Dr. Choksi's functional assessment was also remarkably normal.

After determining that Plaintiff's statements about her disabling pain symptoms were not entirely credible, the ALJ determined that Plaintiff has the RFC to perform "light work," except no overhead work. (R. 27–32.)[12] In

---

[12] Under SSR 83-10, "light work" is defined as:

light of the overall relatively benign physical and neurological exam

findings, fairly decent activities of daily living, and an absence of any

treating physician's opinion that Plaintiff has exertional limitations, the ALJ

gave Dr. Patty's opinion that Plaintiff could perform light work great weight.

(R. 32.)  The ALJ, nonetheless, limited Plaintiff to no overhead work based

on the objective medical evidence of spine disorders from well before

Plaintiff's disability onset date. (*Id.*)

The ALJ properly considered Plaintiff's allegedly disabling pain

symptoms and correctly applied the Eleventh Circuit's pain standard when

---

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing—the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work . . . .

Additionally, SSR 83-10 defines "frequent" as:

> occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

determining Plaintiff's RFC. The ALJ's decision should, therefore, be affirmed.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 24th day of June, 2016.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**